## CROWLEY v. UNITED STATES.
### No. 45648.

Court of Claims.

Nov. 5, 1945.

This case having been heard by the Court of Claims, the court, upon the evidence and the report of a commissioner makes the following special findings of fact:

1. The plaintiff, R. H. Crowley, is an individual, a resident of the United States, and at the time the contract was signed, was a resident of Spokane, Washington.

2. On May 17, 1940, the plaintiff and defendant, the latter represented by the Chicago Quartermaster's Office of the War Department, entered into a written contract whereby the plaintiff, for the consideration of $115,625.00,[1] agreed to furnish all labor and materials for the construction of 150 prefabricated buildings for use in Civilian Conservation Corps camps (delivery F. O. B. cars at Spokane, Washington) in strict accordance with the specifications and schedules, which are in evidence as plaintiff's exhibits 3 and 4, and made part hereof by reference.

3. On May 13, 1940, plaintiff was advised of the award by telegram from the Chicago Quartermaster General's Depot as follows:

"You are hereby awarded the contract for furnishing CCC prefabricated buildings in accordance with items numbered 4, 11, and 12 of your bid dated April 27, 1940 on invitation for bids No. 199–40–286–PB for the amount of $155,685.00 [this was manifestly a typographical error as the record shows it should have been $115,625 and was so acted upon and accepted by the parties] less discount of 2 percent 20 days FOB shipping point Spokane Washington. Letter confirming this telegraphic award together with contract and performance bond for execution will be mailed promptly."

4. On May 14, 1940, a letter was forwarded to plaintiff giving written advice of award of the contract to him, confirming the telegram dated May 13, 1940, whereby he was advised that the contract when submitted would bear date of May 17, 1940, and provided for completion on or before

---

[1] While some of the papers show the contract price of $115,685, this is apparently an error, and should read $115,625.

June 17, 1940. This fixed the commencement date of the contract as of May 17, 1940, and the completion date June 17, 1940.

5. Plaintiff completed the contract on July 13, 1940, 26 days after the completion date. Liquidated damages were assessed against him for 26 days' delay in the sum of $12,091.17. Of this amount, remission of liquidated damages in the sum of $5,203.16 was made, representing nine days' delay, under settlement of the General Accounting Office, leaving liquidated damages assessed against the plaintiff in the sum of $6,888.01.

6. The pertinent contract provisions relating to delays and liquidated damages, upon the basis of which plaintiff made his bid, provide as follows:

"Delays—Liquidated Damages.—If the contractor refuses or fails to make delivery of the materials or supplies within the time specified, or any extension thereof, the actual damage to the Government for the delay will be impossible to determine, and in lieu thereof, the contractor shall pay to the Government, as fixed, agreed, and liquidated damages for each calendar day of delay in making delivery, a sum equal to one-half of one per centum ($\frac{1}{2}$ of $1\%$) of the price of each incomplete unit (one complete camp or complete group of supplementary buildings and materials intended for one camp will be considered a unit), *for each calendar day's delay after the date or dates specified for deliveries,* and the contractor and his sureties shall be liable for the amount thereof: Provided, however, That the Government reserves the right to terminate the right of the contractor to proceed with deliveries or such part or parts thereof as to which there has been delay, and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the Government thereby, together with liquidated damages accruing until such time as the Government may reasonably procure similar material or supplies elsewhere: Provided, further, That the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God or the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes unless the contracting officer shall determine that the materials or supplies to be furnished under the subcontracts are procurable in the open market, if the contractor shall notify the contracting officer in writing of the cause of any such delay within 10 days from the beginning thereof, or within such further period as the contracting officer shall, with the approval of the head of the department or his duly authorized representative, prior to the date of final settlement of the contract, grant for the giving of such notice. The contracting officer shall then ascertain the facts and extent of the delay, and extend the time for making delivery when in his judgment the findings of fact justify such an extension, and his findings thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for making delivery shall be final and conclusive on the parties hereto."

7. For approximately five years previous to the instant contract, plaintiff had been either a member or superintendent of a contracting company engaged in work of making prefabricated CCC Camps, and had had experience in making prefabricated buildings for use as CCC Camps. However, the instant contract was the first that plaintiff had obtained in his individual capacity.

8. After receiving the telegram of May 13, 1940, advising that the contract had been awarded him, plaintiff, without waiting for the receipt of a formal contract, started performance of the work by setting up the necessary machinery and employing labor for the project. Much of the machinery had been used by plaintiff on previous CCC contracts upon which he had worked. Mechanics and some of the carpenters needed on the instant contract were recruited from men who had worked on similar projects and were experienced in this work. Some of the carpenters and the general labor were employed locally and were without experience in cutting lumber for fabrication of CCC Camps.

9. After the machinery was placed contracts were let for about 75% of the lumber to be used on this project. The major portion of the lumber was purchased from "Association" mills and the remainder was,

graded by "Association" graders. The term "Association" mills comprehends all mills which are members of the Western Pine Association, which maintains uniformity of grades, methods and qualities, and which supplies graders and inspectors to classify lumber. The lumber purchased was in the grades called for in the specifications. A substantial quantity of the lumber was delivered by truck on the day the formal contract was signed and the balance was delivered as the contract work progressed.

10. Specifications CCC No. 2, Special Conditions provides as follows:

"SC-4. Inspection of the Work.—The work is entirely under the control of The Q. M. G. and he or his authorized representative may have access to the same at all times. It is contemplated that inspection will be made continuously by a representative or representatives of the U. S. These inspectors may be stationed at the Contractor's plant during the period of fabrication, and all reasonable facilities will be furnished said inspectors for the purpose of assuring themselves that the details of the drawings and the provisions of the specifications are complied with.

"SC-5. Interpretation of Contracts.— Unless otherwise specifically set forth, the Contractor shall furnish all materials, labor, etc., necessary to complete the work according to the true intent and meaning of the drawings and specifications, of which intent and meaning the Resident Engineer shall be the interpreter, except as otherwise provided in this contract, subject to written appeal by the Contractor within 30 days to the head of the Department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime, the Contractor shall diligently proceed with performance. Except when otherwise indicated, no local terms or classifications will be considered in the interpretation of the contract or the specifications forming a part thereof.

"SC-6. Quality of Materials.—Except it be otherwise specified, all materials shall be of the best quality of their respective kinds. Where two or more varieties of materials are specified for any purpose, it shall be optional with the Contractor which is used, but in any one instance the same material must be used throughout for that particular purpose. In all cases where an article is mentioned in the specifications in connection with the words 'best quality,' 'approved

quality,' or 'equal to,' the Resident Engineer shall decide what is the best quality and most suitable article to use, subject to appeal provision included under paragraph SC-5, above."

11. The specifications for forms of fabrication of panels provide that:

"In order to fabricate the various panels accurately and uniformly, the Contractor shall construct the necessary jigs or templates. Beds shall be built to a true line with even surface and constructed of hardwood at least two inches thick, secured together and bolted to heavy underpinning. Forms shall be constructed of steel angle bars, rigidly bolted to bed and bolted or welded together. Forms, Jigs, and Templates must be so constructed as to contain positive provisions to insure an accurate check of the centering and boring of holes in all members. Metal dowel pins will be inserted through guides to retain members in proper position during assembly. All provisions, devices, forms, templates and jigs, must be approved by the Resident Engineer Inspector prior to any fabrication."

It was necessary in order to perform the work required under this contract that certain templates or patterns and also certain forms be made in order that the lumber might be accurately cut into proper-sized roof panels, floor panels, and panels for other portions of the work. For the purpose of making the forms plaintiff had employed a man who was an experienced mechanic and who had made the templates or patterns and forms for previous similar contracts on which plaintiff had been employed.

12. Specifications No. 2, Section I, Specifications for Materials, paragraph 2A, provides as follows:

"All softwood shall conform to Federal Specification MM–L–751a, and all hardwood lumber shall conform to Federal Specification MM–L–736 as to general instructions and to specific requirements as amplified herein.

"Note.—Fabricated Units.—All lumber, including the three classes, boards, dimensions, and finish flooring, purchased by the bidder for use in fabricating the various units of the different camp buildings shall not be lower in grade than that specified for each class of material. After fabricating, each piece shall be subject to the further restrictions as to knots, shakes, crooks, and other defects specified for each class, espe-

890

cially shakes or splits in any piece intended for roof trusses, joists, and rafters. (See Par. 2–B for Specific widths of boards permitted.) Irrespective of grading rules quoted, any materials having defects that would be obviously detrimental, either to the construction or for the use for which it is intended, will not be accepted in fabricated materials."

Specifications CCC No. 2, Special Conditions, paragraph SC–12, provides:

"SC–12. Inspection and Acceptance or Rejection of Work.—The Contractor must understand that all materials, built-up sections, etc., delivered by him prior to final acceptance and payment for same, shall be subject to the inspection of The Q. M. G., or his authorized agent, with full right to accept or reject any part thereof, and that he must, at his own expense, within a reasonable time remedy any defective or unsatisfactory materials, and that in event of his failure to do so, after notice, the C. O. shall have full right to have same replaced and to deduct the cost thereof from any money due to the Contractor. The Resident Engineer may require the removal of rejected material from the site of the work.

"Authorized agents of the United States, other than those designated by the Contracting Officer, shall be given full opportunity to inspect materials, built-up sections, etc., at any and all times."

13. The Resident Engineer arrived at plaintiff's plant on May 26, 1940, nine days after the commencement date of the contract, and after about one-third of the contract time for completion had expired. Certain of the forms for fabrication of panels had been completed and plaintiff was completing the form for the floor panels. The specifications provided that the form be constructed of steel angle bars, rigidly bolted to bed and bolted or welded together. Plaintiff used 2″ to 2½″ angle irons on a wooden floor, heavily bolted, in accord with his previous experience on similar contracts. Defendant's Resident Engineer refused to accept the forms of floor and roof panels on the ground that they were not heavy enough. Plaintiff, in order to meet the requirements of the inspector, then had manufactured at a cost of about $50.00, forms made of 5″ and 7″ channel irons for the floor and roof panels. These did not prove wholly satisfactory, many panels being damaged and wasted in their removal from the forms.

14. The Resident Engineer in requiring the change in forms, upon his belated arrival at the plant, caused four days' delay in plaintiff's operations, about $50 cost of forms and some wasted panel material. The action of the Resident Engineer in requiring heavier forms was taken in good faith, under his interpretation of the contract.

15. Prior to the arrival of defendant's Resident Engineer, whose duties included the inspection and approval of material and fabrication, substantial progress had been made in contract operations but in compliance with the provisions of the specifications, plaintiff did not proceed, except in a limited way, with actual fabrication pending arrival of defendant's Resident Engineer. Upon his arrival there was a large quantity of lumber on hand at plaintiff's plant, including finished flooring, subflooring, roof sheathing, all cut to exact lengths. A quantity of sill stock of 2 x 8's had arrived and was being dipped. A large quantity of truss members had been fabricated. The lumber had been ordered as indicated in the specifications.

Defendant's inspector refused to accept a quantity of 2 x 8's, 2 x 4's, and 2 x 6's containing black knots which had black rings around them, although the grading rules permit No. 2 dimension lumber to have sound knots not larger than 2½″ in diameter. This situation also applied to lumber for flooring and siding. Much of this lumber was sound and suitable for the purpose intended.

The action of the Resident Engineer in rejecting so large a quantity of the lumber as described, and his requirement that lumber of better quality be used, caused plaintiff to provide a crew of two or three men, who spent their time in the particular work of cutting the lumber to remove the objectionable knots at additional expense, waste of lumber, and material delay in performing the contract work.

16. The defendant's inspector did not, at any time, expressly direct or request plaintiff to furnish a higher grade of lumber than called for by the specifications, but he declined to accept the lumber without elimination of the knots, which under his interpretation of the contract specifications would lessen the strength of the fabricated panels or members, and he required a better quality of lumber.

Plaintiff, in view of the quantity of lumber to which the Resident Engineer objected, purchased lumber of a higher grade than he had on hand, in order to save his contract time and prevent further waste. This caused considerable additional expense as well as occasional idle time of machines and labor, lasting an hour or more on several occasions, while waiting for lumber.

17. The defendant's inspector suggested to plaintiff that he sort the lumber and repile it, using the better or higher quality pieces out of the particular grade for specific uses and the lower quality pieces of the grade for other specific uses. Plaintiff objected to sorting the lumber on the ground that he was complying with the specifications in his purchase and use of the lumber and that it would cause delay and cost considerable money to sort the large quantity of lumber on hand.

Plaintiff, however, upon the inspector's refusal to accept the lumber did sort certain parts of it, using the best pieces for roof panels and the less desirable pieces for subfloor panels, and did cut out black knots with black rings around them.

18. Plaintiff furnished for table tops No. 1, common, as provided in the specifications, but this was unacceptable to the inspector who required a better quality of lumber. After considerable delay in trying to locate lumber that would meet with the inspector's approval, plaintiff purchased select Idaho pine which is a higher grade and more expensive. This the inspector finally accepted. The Government determined that the inspector had interpreted the specifications for mess table tops as including a better grade of lumber than No. 1 common dressed lumber prescribed in the contract, which caused the contractor to procure therefor particular lumber at an excess cost of $336.91. Since this item has already been allowed by the defendant it is not in dispute here.

19. Defendant's Resident Engineer was privileged to make his inspection of lumber at any place that he desired, but with respect to table tops and other fabricated items, the inspector waited, in many instances, until these items were fabricated and lined up for loading in cars and made his objection there, necessitating the taking apart and rebuilding or repairing of panels, which resulted in duplication of work, waste of lumber, and additional expense.

20. Defendant's Resident Engineer was experienced as an engineer and as a lumberman in the Southeastern States, but his experience with the classes and grades of lumber in the Northwest, such as was used in plaintiff's contract, was limited. One of the Resident Engineer's assistants was without experience in lumber used on the instant contract, while the other assistant is not shown to have had qualifications as an inspector.

21. Within the same grades of lumber there will be a range of quality. All lumber No. 2 grade will not be of the same quality, but there are ranges within the grade, some of which will approximate high quality of the preceding grade and low quality of the next higher grade. Cutting operations, if properly conducted, would eliminate many defects in lumber by allowing varying qualities within the grade to be used in fabrication of different items required under the specifications without going outside the grade range set by the specifications.

22. The elimination of so-called defects appearing in certain grades of lumber converts it into lumber of higher quality and elimination of defects by cutting operations may cause the finished product to appear better in quality than the identical lumber from which it was made.

Plaintiff, in cutting and fabricating the lumber did eliminate many of the defects originally in the respective grades which tended to make the lumber show up as of a higher quality.

23. Defendant's Resident Engineer was rigid in his inspection and rejection of the lumber and fabricated units on the instant project. His action in rejecting the lumber for table tops and requiring the higher grade of lumber therefor was unreasonable. His rejection of a considerable amount of lumber and fabricated units which contained sound knots and requiring a better quality of lumber in place thereof, in effect, amounted to unreasonable action on his part. In these rejections the Resident Engineer acted under his interpretation of the specifications. His action is attributable to his limited experience with the particular character of lumber grown in the Northwest, which was used on this project. It is impossible to determine from the record any definite amount of the lumber so improperly rejected.

24. Had defendant's Resident Engineer arrived at plaintiff's plant at the commencement of the contract time, May 17, 1940,

and made his objections to the forms and lumber at that time, plaintiff would have been saved much of the delay in performing the contract, duplication of work, waste of lumber, and expense due to disorganization and confusion in carrying on the work under the contract.

It is not possible under the proof to determine a definite period of delay caused plaintiff by reason of the belated arrival of the Resident Engineer, but a fair approximation is fifteen days, exclusive of the four days determined for manufacture of forms, as set forth in finding 14.

25. Defendant contends that plaintiff's workmanship was inefficient and caused serious delay and additional expense.

On two occasions plaintiff loaded a number of panels into cars without inspection and was required to unload the panels for inspection. It is not shown that this act was intentional.

The specifications provided that fabricated lumber must be shipped in sequence for erection of finished units. The proof shows that at times carloads of fabricated material were loaded out of sequence. The Resident Engineer refused to issue bills of lading until material could be shipped out in sequence. The result was that at times, there was congestion in the yards and there is some evidence of an item of demurrage for loaded cars remaining too long. It is not shown to what extent, if any, the contract work was affected by this situation.

Some of plaintiff's carpenters were without experience in performing this particular class of work, and until they became accustomed to the cutting and boring machines made some errors. There was faulty workmanship on some of the material.

In cutting lumber for studs and gables a quantity of 2 x 4's and 4 x 4's was not cut or pointed to the same pitch as the rafters and roof of the house. The Resident Engineer used some of them that could be used while some were repaired and used, and a quantity were rejected. Those rejected were thrown away. The proof fails to show what quantity was wasted.

Specifications called for roof plates made from 2 x 6 lumber 12 to 16 feet in length. The roof plates were not to be bored. However, plaintiff cut and bored 10-foot lengths. The Resident Engineer permitted use of such as were regarded as suitable. A large part of ten or fifteen thousand feet was corrected but perhaps one-fourth of the lot was wasted.

Specifications for rafters required lumber 12' long to be bored and of such quality that a knot or shake would not injure the strength of the pieces. About 1,400 pieces were improperly bored and used for truss members. In this process there was waste.

Some waste in sheathing lumber was caused on account of the boards being of improper width which caused their rejection. The proof does not indicate what amount of sheathing was rejected and wasted.

The specifications called for floor joists to be made from material which was $1\frac{5}{8}$ x $5\frac{5}{8}$. Plaintiff cut a number of pieces of lumber which the Resident Engineer believed to be too short and too narrow to meet the specifications. The Resident Engineer rejected a number of such pieces where, in his judgment, there was too much difference in the width and in those instances the floor joints were required to be removed and replaced with lumber which met specifications. Some waste in lumber was occasioned thereby.

After fabrication of garage roof panels some were stacked outside of the building and some of the lumber in the panels shrank, causing knots to become loose. These panels had to be replaced with sound lumber. This caused some waste.

Certain ridge plates in the end of the roof panels were made too narrow, due to use of 2 x 4's instead of 2 x 6's. Some were rejected. Some lumber was broken up and wasted in removal from the panels.

In interior partition panels some of the lumber shrank, knots became loose, and many panels were rejected. In removing the rejected pieces from the panels they were broken and wasted. The proof does not indicate what amount of this lumber was wasted.

Mechanical defects in the construction of some of the panels also occurred. On some of the wall panels where 2 x 4's and 2 x 6's came together, the timbers failed to flush on one side, making it necessary to withdraw some and replace with new panels, or to nail the toe in such direction as to make the member flush on the face side.

26. The proof shows that plaintiff used lumber that was within grade, as indicated in the specifications, but in some instances, as hereinbefore described, there was faulty

workmanship which contributed to slowing down of operations and caused some waste and additional cost. It is impossible to determine from the record a definite amount of waste caused by acts attributable to plaintiff. A fair approximation is seven days.

27. On June 12, 1940, plaintiff protested to the Chicago Quartermaster Depot against the actions of the inspector in rejecting the forms which plaintiff had made, and in requiring the use of a better grade of lumber, which he termed arbitrary, and requested an extension of two weeks' time in which to complete performance of the contract. This request for extension was denied by letter from the Chicago Quartermaster Depot dated July 5, 1940.

28. The work was completed on July 13, 1940, and plaintiff was paid sums aggregating $99,331.89, being the contract price of $115,625 less discount of $2,312.50, freight adjustment of $1,889.44 and liquidated damages in the amount of $12,091.17 for failure to complete within specified time.

29. On August 7, 1940, plaintiff filed with the Quartermaster General a claim in the amount of $39,999.86 for extra labor and material furnished on demand of the inspector and remission of liquidated damages.

30. On November 8, 1940, the Contracting Officer made special findings of fact which were transmitted to plaintiff on November 9, 1940, setting forth the full and complete basis upon which the denial of extension of time, denial of waiver, the refunding of liquidated damages and denial for extra compensation were based.

31. On November 13, 1940, the plaintiff wrote the Quartermaster General protesting the adverse decision of the Contracting Officer and the interpretations of the Resident Engineer and taking exceptions to the Contracting Officer's findings of fact of October 3, 1940. The Quartermaster General, treating this letter in the nature of an appeal from his findings of fact, wrote the Under Secretary of War on January 28, 1941 recommending approval of the Contracting Officer's findings of fact and denial of the contractor's appeal.

32. On March 4, 1941, the Brigadier General, United States Army, Director of Purchases and Contracts, acting on behalf of the Secretary of War, issued a memorandum dealing with the appeal from findings of fact under this contract under which it was recommended that nine days' extension of time should be allowed to the contractor due to the late arrival of the Resident Engineer, and that a credit of $336.91 should be allowed the contractor for the excess costs alleged to have been incurred by him in the procurement of mess table tops. Under date of March 8, 1941 the Secretary of War filed his findings of fact relative to the appeal of the contractor from the engineer's interpretation of the specifications as well as the appeal from the findings of fact of the Contracting Officer. This final determination recommended that a nine days' extension of time should be allowed to the contractor and remission of liquidated damages for this period be allowed, and that a credit be allowed the contractor of $336.91 for excess costs involved in the procurement of the mess table tops.

33. On August 6, 1941, settlement of plaintiff's claim issued from the General Accounting Office, Washington, D. C., to R. H. Crowley on his claim for liquidated damages, expenses incurred for extra materials and labor, excessive waste of materials and additional overhead expenses alleged to have been incurred in the performance of the contract. Under this settlement plaintiff's claim was disallowed in the amount of $34,459.79, and allowed in the sum of $5,540.07. The allowed portion of the claim represented the excess costs which were claimed in connection with table tops in the sum of $336.91, and remission of liquidated damages for nine days' delay in delivery, which were admitted to be due to the late arrival of the Resident Engineer. However, payment of the allowed portion of the claim, namely, $5,540.-07, was suspended on the theory that the plaintiff was one of the defendants liable for payment of claim due to the United States in the sum of $119,057.90 arising out of default on prior contracts. The allowed portion of the claim, which is herein admitted as due under the settlement from the United States, was suspended for application against indebtedness claimed to be due to the United States by the plaintiff herein.

34. The defendant's action in disallowing the amount found due plaintiff is set forth in statement of the General Accounting Office dated August 6, 1941, as follows:

"By certificate of settlement No. US–6915–FSA (W) (CCC), dated February 29, 1940, the Crowley Millwork Company, Spo-

kane, Washington, in which the above-named R. H. Crowley had an interest, was certified to be indebted to the United States in the amount of $119,057.90, arising from its default under contracts Nos. W–5921–qm–ECW–138, dated June 12, 1935; W–.5902–qm–ECW–48, dated June 8, 1935; W–5913–qm–ECW–68, dated June 8, 1935; W–5916–qm–ECW–91, dated June 8, 1935; ·W–5915–qm–ECW–62, dated June 8, 1935; W–5919–qm–ECW–112, dated June 7, 1935; W–5914–qm–ECW–113, dated June 8, 1935; and W–5908–qm–ECW–71, dated June 8, 1935. Said indebtedness has been referred to the Attorney General for collection and to date has not been liquidated.

"Accordingly, the amount of $5,540.07, representing the excess cost claimed in connection with the table tops and liquidated damages assessed for 9 days' delay in the delivery of the various units under contract No. W–199–qm–CIV–1957, supra, is hereby suspended for application against said indebtedness."

35. The Crowley Millwork Company was a corporation organized under the laws of the State of Washington. Plaintiff was given one share of stock. He contracted to purchase approximately 99 shares additional and gave his promissory note therefor dated January 2, 1933, due January 2, 1934, which was never paid. The shares of stock were never issued to plaintiff. Plaintiff attended the first directors' (organization) meeting and became secretary and also treasurer. He received no dividends. He drew a salary for labor performed for the corporation. Under date of February 1, 1938, plaintiff and the corporation executed an instrument whereby the corporation and Crowley mutually released each other from claims existing in favor of each other, and plaintiff had no further relation with the corporation.

36. Had plaintiff's performance period been extended for 19 days his contract should have been completed on July 6, 1940. (See findings 14 and 24.) Liquidated damages for deliveries after July 6, 1940, amount to $2,071.55. Subtracting this amount from the $12,091.17 liquidated damages assessed, as set forth in finding 5, leaves $10,019.62.

37. In considering the various types of lumber required and the processing thereof a 20% allowance is a reasonable estimate for waste in cutting and processing the total lumber purchased. Allowing 20% waste on lumber purchases, plaintiff's excess costs of material and labor on the contract in suit is $15,311.83, as shown by the following:

| Item: | Excess cost |
|---|---|
| Flooring | $5,873.66 |
| 2 x 4's | 2,997.07 |
| 2 x 6's | 2,586.90 |
| 2 x 8's | 563.28 |
| Siding | 3,279.71 |
| Interior panels | 1,016.60 |
| Labor costs not otherwise allocated | 2,064.13 |
| | 18,381.35 |

From the above total of $18,381.35, there is deducted $3,069.52, representing a recovery of $1,869.52 for lumber left over and sold at the termination of the contract, and $1,200 of saving in labor (computed on unused lumber at $12 per 1,000 for 100,000 board feet), leaving net excess costs of $15,311.83.

H. Russell Bishop, of Washington, D. C. (H. D. Driscoll, of Washington, D. C., on the brief), for plaintiff.

Mary K. Fagan, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and WHITAKER, JONES, LITTLETON, and MADDEN, Judges.

JONES, Judge.

This case involves extra labor and material costs and liquidated damages.

R. H. Crowley, plaintiff, agreed to manufacture and deliver prefabricated buildings f. o. b. Spokane, Washington, to be used by the defendant in the erection of a CCC Camp. He was advised of the award on May 13, 1940, and since the agreement stipulated that the work should be completed within 30 days from May 17, 1940, he began work without awaiting the receipt of a formal contract, which was not signed until June 11, 1940. The contract price was $115,625.

The work was completed on July 13, 1940, 26 days after the specified completion date. Liquidated damages were assessed against plaintiff for the 26 days' delay in the sum of $12,091.17. On appeal the Secretary of War remitted liquidated damages in the sum of $5,203.16, representing 9 days' delay, and also allowed plaintiff $336.91 extra costs of some table tops caused by a change in the materials required. These amounts, however, have not been paid plaintiff, pay-

ment being held up by the General Accounting Office as an offset to the defendant's claim against a corporation in which it asserts plaintiff had an interest, but which had no connection with this contract.

Defendant's resident engineer did not arrive at plaintiff's plant until May 26, 1940, 9 days after the commencement date of the contract, and after about one-third of the contract time for completion had expired. Some of the forms for fabrication of panels had been completed and plaintiff was completing the form for the floor panels. The resident engineer refused to accept the forms for floor and roof panels claiming that they were not heavy enough for the purpose. New forms and panels were constructed.

Defendant's inspector refused to accept a quantity of the lumber containing black knots which had black rings around them, although the grading rules permitted No. 2 dimension lumber to have sound knots not more than 2½ inches in diameter. The same ruling was made as to lumber for flooring and siding. Much of this lumber was sound and suitable for the purpose intended.

The resident engineer, while an experienced lumberman, had not had experience in the particular type and quality of lumber required for this purpose in the particular area. His rulings made it necessary for plaintiff to use a better quality of lumber than the specifications called for, although he at no time specifically directed that this be done.

Plaintiff claims that this action made it necessary for him to furnish more expensive materials than otherwise would have been required, resulting in extra costs and extra labor; that the rejection of so much of the material caused delay in the completion of the contract, and that consequently he should be permitted to recover this extra cost and that he should also be repaid the amount of the liquidated damages which were assessed against him. He asserts the delay was the fault of the defendant.

There is considerable ground for this complaint on the part of the plaintiff. However, the terms of the contract and the adverse action of the Department preclude recovery on most of these items.

Article 12 of the contract makes the action of the contracting officer on disputed questions of fact final, subject to appeal within 30 days to the head of the department. The specifications, SC-5, make final the interpretation of the drawings and specifications by the resident engineer, subject to appeal within 30 days to the head of the department.

The appeal was taken, the Secretary of War remitted liquidated damages for the 9-day delay covered by the belated arrival of the resident engineer, and allowed plaintiff the item of increased costs due to the better quality of the lumber required for the table tops than was designated in the specifications.

The resident engineer was rigid and extreme in his interpretation of the contract and specifications. If the two provisions, referred to above, were the only ones involved we would be inclined to hold that the action of the engineer in charge was so clearly erroneous as to imply legal bad faith. This was not intentional on his part. It was due to his inexperience in the type of lumber in that area called for by this contract. The lumber had been graded by the inspectors of the Association. It met their grading rules, as graded by them measured up to the quality called for in the specifications. It was suited to the purposes for which it was to be used. The action of the resident engineer in charge caused plaintiff delay and extra expense.

However, in addition to the provisions mentioned above, there were two others. One of them on materials (Specifications No. 2, Section I, paragraph 2 A) contained the following language:

"Irrespective of grading rules quoted, any materials having defects that would be obviously detrimental, either to the construction or for the use for which it is intended, will not be accepted in fabricated materials."

The other provision (Specifications CCC No. 2, SC-6) was as follows:

" * * * In all cases where an article is mentioned in the specifications in connection with the words 'best quality', 'approved quality', or 'equal to', the Resident Engineer shall decide what is the best quality and most suitable article to use, subject to appeal provision included under paragraph SC-5, above."

■ These provisions, to which plaintiff agreed, make the question of the quality of the materials one of fact to be determined by the resident engineer. In the light of these plain provisions we are unable to hold that the action of the resident engineer was

so arbitrary as to imply legal bad faith. United States v. Gleason, 175 U.S. 588, 602, 20 S.Ct. 228, 44 L.Ed. 284.

Plaintiff, however, is entitled to recover the sum of $5,540.07 in accordance with the decision by the head of the department.

The reason assigned by defendant for nonpayment is that the plaintiff had an interest in the Crowley Millwork Company, a corporation, of Spokane, Washington, and that such company was indebted to the United States, arising out of the alleged default of such corporation in several contracts dated in 1935, which claims had not been liquidated.

Plaintiff had only a small interest in that corporation. On February 1, 1938, the plaintiff and the Crowley Millwork Company executed an instrument whereby the corporation and Crowley mutually released each other from all claims in favor of either, and since that date plaintiff has had no further relations with that corporation. Since it was a corporation and he never had any substantial interest in it, and since his relationship with it was completely severed more than two years before the making of the instant contract, the defendant is not entitled to offset the debt owned from it to plaintiff by any claims which it may have against the Crowley Millwork Company.

The plaintiff is entitled to recover the sum of $5,540.07. It is so ordered.

WHITAKER and LITTLETON, Judges, and WHALEY, Chief Justice, concur.

MADDEN, Judge, took no part in the decision of this case.